United States District Court
Northern District of California

1
2
3
4                        UNITED STATES DISTRICT COURT
5                     NORTHERN DISTRICT OF CALIFORNIA
6
7    BERNARDO ALCARAZ,                        Case No. 18-cv-02801-SI
8              Plaintiff,
                                             ORDER GRANTING PLAINTIFF'S
9         v.                                 MOTION FOR PRELIMINARY
                                             INJUNCTION AND DENYING
10   KMF OAKLAND LLC, et al.,                 DEFENDANT ALTEZZA'S MOTION
                                             TO DISMISS
11             Defendants.
                                             Re: Dkt. Nos. 43, 44, 76, 90
12
13
14        Before the Court are plaintiff Bernardo Alcaraz's motion for preliminary injunction and

15   defendant Altezza Condo LLC's motion to dismiss the third amended complaint.  Dkt. Nos. 76, 90.[1]

16   The motions came on for telephonic hearing on June 11, 2020.

17        Having considered the papers and arguments and for good cause shown, the Court DENIES

18   defendant's motion to dismiss and GRANTS plaintiff's motion for a preliminary injunction.

19
20
21
22
23   _____
          [1] Also still pending on the Court's docket are two October 2019 motions: plaintiff's *pro se*
24   motion for preliminary injunction and defendant Altezza Condo LLC's motion to dissolve the
     temporary restraining order ("TRO").  *See* Dkt. Nos. 43, 44.  As the Court previously explained, *see*
25   Dkt. No. 70 at 1, the *pro se* motion for preliminary injunction, Dkt. No. 43, is DEEMED
     WITHDRAWN upon the filing of plaintiff's motion by counsel.  Defendant's motion to dissolve
26   the TRO, Dkt. No. 44, is DENIED AS MOOT in light of the fact that plaintiff has since posted the
     bond that the Court ordered when granting the TRO.  *See* Dkt. No. 83.  Defendant made no further
27   argument in support of its motion to dissolve the TRO in this latest round of briefing, nor did
     defendant file a reply brief in support of the motion to dissolve the TRO despite opportunity to do
28   so.  *See* Dkt. No. 70 at 2.

# BACKGROUND

## I.      Factual Background

As set forth in this Court's Order Granting Plaintiff's Application for a Temporary Restraining Order, this lawsuit arises from plaintiff's assertion that, on account of his race, color, and/or national origin, defendants have undertaken eviction proceedings against him and have refused to sell him the residence that he occupies.  *See* Dkt. No. 38.  The following allegations are drawn from the third amended complaint.  Dkt. No. 73 ("TAC").

Plaintiff Bernardo Alcaraz, a Mexican born, Hispanic-American, emigrated to the United States in 1991 and became a naturalized United States Citizen in 1997.  *Id.* ¶ 2.  On August 28, 2010, Mr. Alcaraz signed a lease for a two-bedroom apartment at 6465 San Pablo Avenue, Apartment #403, Oakland, California, and has lived there ever since.  *Id.*  ¶¶ 9, 13; *see also* Dkt. No. 73-1, TAC Ex. A at 6 (Lease Agreement).[2]  Apartment #403 is a unit in a 33-unit building now called "The Emerson."  TAC ¶ 9.  In 2010, Cascade Acceptance Corp. owned The Emerson.  *Id.* ¶ 10.

Prior to signing the lease agreement, Mr. Alcaraz states he spoke with an Emerson manager. *Id.* ¶¶ 10-11.  Specifically, the manager stated that in the future Emerson units would be individually sold.  *Id.* ¶ 11.  Mr. Alcaraz further states the manager indicated individuals occupying the units would have first priority to purchase their units when they were sold.  *Id.*  Additionally, the lease agreement indicates: "The Trustee will rent units in the building until the market is sufficiently active to allow individual units to be sold over a reasonable period of time, although he may sell the building as a whole to another entity that might hold it as a rental or sell individual units as the market allows."  TAC Ex. A at 6 (Lease Agreement).

On or around March 30, 2011, defendant KMF Oakland, LLC ("KMF") purchased The Emerson from Cascade Acceptance Corp., with defendant Klingbeil Capital Management, Ltd. ("Klingbeil") as the management company.  TAC ¶¶ 14-15; *see* Dkt. No. 73-2, TAC Ex. B at 2 (County of Alameda Assessor's Office Property Ownership Records).  Mr. Alcaraz states that from

---

[2] For ease of reference, all page citations in this Order are to the page numbers stamped by the Court's Electronic Case Filing system at the upper righthand corner of documents.

United States District Court
Northern District of California

the start of KMF's ownership, The Emerson was managed by Johnny Rodriguez. TAC ¶ 15. "For the duration of Mr. Rodriguez's work at The Emerson, he exhibited a discriminatory, hostile, and adversarial attitude of racial/ethnic/national origin/ancestry animus toward Mr. Alcaraz, apparently believing that, due to being Mexican, Mr. Alcaraz was not fit to be a tenant at The Emerson." *Id.* ¶ 17. Specifically, Mr. Alcaraz states, during their first interaction, Mr. Rodriguez asked Mr. Alcaraz if he was at The Emerson to perform maintenance work. *Id.* ¶ 18. Mr. Alcaraz states Mr. Rodriguez would tell Mr. Alcaraz, on occasion, that he spoke English well. *Id.* Additionally, every so often, the manager would ask, "'Oh, you're still here?' –implying surprise" that Mr. Alcaraz was capable of remaining as an Emerson tenant. *Id.* Mr. Alcaraz further states that at one time Mr. Rodriguez asked Mr. Alcaraz if his car was in fact owned by his employer. *Id.* Mr. Alcaraz states that sometime in 2015 the manager told him "he looked like he was more suited to perform maintenance work at The Emerson than to be a tenant." *Id.*

In early 2015, Mr. Alcaraz states he "began being assessed 'late' fees on rent checks that he had timely paid by mail." *Id.* ¶ 19. Mr. Alcaraz states that at that time, an individual named Bianca Rodriguez was responsible for processing the rent checks and that she was in a romantic relationship with Mr. Rodriguez. *Id.* ¶ 20. In mid-2015, Mr. Alcaraz states he began to hand deliver his rent checks to Ms. Rodriguez's office in San Ramon, California, to ensure the department received his rent checks. *Id.* ¶ 22. Mr. Alcaraz states he would call ahead to confirm Ms. Rodriguez would be present when he delivered the checks, but on most of Mr. Alcaraz's attempts, she would no longer be in the office when he arrived. *Id.* Mr. Alcaraz states he would leave his rent checks under the office door as instructed, but his rent checks continued to be processed either untimely or not at all. *Id.* "On at least one occasion, Ms. Rodriguez called Mr. Alcaraz to tell him she did not receive his rent check even though Mr. Alcaraz had delivered it." *Id.*

On September 24, 2015, KMF filed an unlawful detainer action against Mr. Alcaraz, attempting to evict him for unpaid rent. *Id.* ¶ 23. In response to the unlawful detainer action, Mr. Alcaraz states they reached an agreement. *Id.* ¶ 24. Mr. Alcaraz would deliver his rent checks to another KMF employee (not Ms. Rodriguez) and KMF would dismiss the action. *Id.* ¶ 25. Although Mr. Alcaraz repeatedly attempted to memorialize the new agreement and KMF agreed to

3

memorialize the new agreement, KMF never memorialized the new agreement in Mr. Alcaraz's lease. *Id.*

In early 2016, Mr. Alcaraz states the management company (defendant Klingbeil) again failed to process his rent checks. *Id.* ¶ 26. On March 11, 2016, KMF initiated a second unlawful detainer action ("the UD Action") against Mr. Alcaraz in state court even though Mr. Alcaraz had submitted all his rent checks to Klingbeil as required. *Id.* While that case was pending, in late June 2016, KMF sold The Emerson to defendant Altezza Condo LLC ("Altezza" or "defendant").[3] *Id.* ¶ 27; TAC Ex. B at 2 (County of Alameda Assessor's Office Property Ownership Records); Dkt. No. 73-9, TAC Ex. I at 2-3 (Grant Deed). Mr. Alcaraz states he made his July 2016 rent payment to the company designated by Altezza and that "[t]he rent check was processed without issue." TAC ¶ 29. Mr. Alcaraz alleges he inquired about the UD Action with employees of both the prior management company and the new management company for the building and was assured that, because of the building sale, the UD Action would not continue. *Id.* ¶¶ 30-31. Based on these representations, Mr. Alcaraz states he traveled internationally on business in late July 2016. *Id.* ¶ 32; *see* Dkt. No. 73-13, TAC Ex. M at 2-3 (Passport Pages). On August 1, 2016, KMF secured a judgment of possession in the UD Action. *Id.* ¶ 33. "Mr. Alcaraz was not in attendance at the court proceeding since he was under the impression that the action would not proceed." *Id.*

On August 26, 2016, Mr. Alcaraz states he received a letter from Mark Chow, at an Altezza-hired real estate marketing and sales firm. *Id.* ¶ 35; Dkt. No. 73-14, TAC Ex. N at 2-3 (Aug. 26, 2016 Mark Chow Letter). The letter indicated Altezza was selling units in The Emerson and Altezza was giving unit renters the first opportunity to purchase the units. *Id.* The letter stated, in part,

> The owners would like to provide you the first opportunity to purchase your unit at the price below:
>
> Unit #403

---

[3] In its answer to the second amended complaint, Altezza admitted purchasing the building from KMF "in or around June 28, 2016." Dkt. No. 35 ¶¶ 50-51. In its opposition to the motion for preliminary injunction, Altezza now takes the position that it purchased the building in August 2016. *See* Dkt. No. 86 at 6 (citing Dkt. No. 88, Burke Decl. ¶ 6).

United States District Court
Northern District of California

Price $630,000

TAC Ex. N at 2.  On September 30, 2016, Mr. Alcaraz states he spoke on the phone with Mr. Chow, who indicated they would sell Apartment #403 to Mr. Alcaraz.  *Id.*  Mr. Alcaraz memorialized their phone call in an email that same day.  TAC ¶ 36; *see* Dkt. No. 73-15, TAC Ex. O at 2 (Sept. 30, 2016 Email to Mark Chow).  During the September 30 phone call and again in the email, Mr. Alcaraz indicated that he had a property in Mexico for sale that would net around $389,000.  TAC ¶ 36. Combining this with his liquid funds, Mr. Alcaraz indicated that he would purchase his unit in "an all cash sale, and that [he] would like to expeditiously move towards closing."  *Id.*  He then went through with the sale of his property in Mexico in order to purchase his unit in The Emerson.  *Id.* ¶ 37.

Mr. Alcaraz alleges that in 2017 individual Emerson units began to be sold as condominiums.  *Id.*  ¶ 39.  Additionally, Mr. Alcaraz alleges Altezza sales agents discriminatorily acted against prospective buyers if they appeared to be Hispanic or African American.  *Id.*  ¶ 40. Mr. Alcaraz states he observed Altezza sales agents be unfriendly toward Hispanic or African American prospective buyers and make them wait around longer for help "while more quickly attending to other prospective buyers."  *Id.*  "On one occasion, while Mr. Alcaraz happened to be passing through the lobby, a Hispanic-appearing couple came in to inquire about viewing a unit. When Mr. Alcaraz returned to the lobby some time later, the couple was still there.  Mr. Alcaraz spoke with them in Spanish and confirmed they were still waiting to speak with a sales agent. Having been kept waiting for a long time, the wife suggested to the husband that they should simply leave."  *Id.*

Mr. Alcaraz states he would periodically ask Altezza sales agents if he could move forward with his unit purchase, and the agents would respond indicating the unit was not ready for sale.  *Id.* ¶ 41.  In late 2017, Mr. Alcaraz states one of the sales agents, Amy Fox, "told Mr. Alcaraz that Altezza would not sell him his home.  She told him that the owners would sell to anyone but him. When Mr. Alcaraz asked Ms. Fox why the owners would not sell to him, . . . Ms. Fox told him it was because they did not like him.  Mr. Alcaraz never received another explanation as to why

Altezza would not sell to him."[4]  *Id.*  ¶ 42.

In early 2018, Mr. Alcaraz states Ms. Fox sought to talk to him about moving out.  *Id.* ¶ 44. Mr. Alcaraz further states, by mid-2018, "all of the units in The Emerson, except for Mr. Alcaraz's home, had been sold at least once.  None of the buyers were of Hispanic descent.  The units comparable to Mr. Alcaraz's home were all sold in the range of $630,000."  *Id.* ¶ 45.

On October 5, 2018, KMF obtained a Writ of Possession for Apartment #403 based on the judgment in the UD Action.  *Id.* ¶ 47; Dkt. No. 73-18, TAC Ex. R at 2-3 (Writ of Possession).  Mr. Alcaraz alleges KMF obtained the writ "with the presumptive assistance and participation of Altezza and Klingbeil, as KMF had ceased to operate in California no later than November 13, 2017[.]" TAC ¶ 47.  Subsequently, on October 23, 2018, Mr. Alcaraz states he received a Notice to Vacate from the Alameda County Sheriff's Office.  *Id.* ¶ 48; Dkt. No. 73-19, TAC Ex. S (Notice to Vacate). Sometime between July 25, 2019, and August 15, 2019, Mr. Alcaraz states Altezza "started anew the eviction process" based on the 2016 unlawful detainer judgment.  TAC ¶ 49.

## II.    Procedural Background

On May 11, 2018, Mr. Alcaraz, acting *pro se*, filed the present lawsuit in this Court against defendant KMF.  Dkt. No. 1.  On November 21, 2018, Mr. Alcaraz filed a first amended complaint. Dkt. No. 9.  On July 22, 2019, with the Court's permission, Mr. Alcaraz filed a second amended complaint, adding Altezza Condo LLC as a defendant, and bringing claims for violation of the federal Fair Housing Act ("FHA"), violation of the Fourteenth Amendment right to Due Process, and injunctive relief.  *See* Dkt. No. 23.

On September 13, 2019, Mr. Alcaraz filed an ex parte application for a TRO.  Dkt. No. 28. The Court ordered that Mr. Alcaraz serve the defendants and set a hearing on the TRO for October 11, 2019.  Dkt. No. 33.  Altezza filed an opposition to the TRO application and filed an answer to the second amended complaint.  Dkt. Nos. 30, 35.  On October 11, 2019, after holding a hearing at

---

[4] Mr. Alcaraz explains further in his declaration, "I asked Ms. Fox as to why Altezza would not sell to me, and her response was to the effect of: 'I don't think they like you.'  When I asked her to elaborate, she responded with something to the effect of: 'I don't know, they just don't want to sell to you.'"  Dkt. No. 77, Alcaraz Decl. ¶ 45.

which Altezza appeared, the Court granted Mr. Alcaraz's application for a TRO.  Dkt. No. 38.  The Court enjoined "defendants (or their officers, agents, servants, employees, and attorneys) and the Alameda County Sheriff's Office from proceeding on the execution of the writ of possession obtained in Alameda County Superior Court with regard to the residence at which Alcaraz resides at 6465 San Pablo Avenue, Unit 403, Oakland, California, pending resolution of Alcaraz's motion for a preliminary injunction." *Id.* at 9.  The Court set a hearing on the motion for preliminary injunction for December 6, 2019, and ordered that Mr. Alcaraz post a bond in the amount of $5,000.00 by October 18, 2019. *Id.*

Mr. Alcaraz requested and received a one-week extension of time to post the bond.  Dkt. Nos. 40, 42.  When he failed to post a bond by the new date, the Court issued an order on November 7, 2019, ordering that he post the bond "IMMEDIATELY."  Dkt. No. 54.  Mr. Alcaraz posted a bond on November 8, 2019, but the payment was returned for insufficient funds.  *See* Dkt. Nos. 56, 57.

In the meantime, on November 1, 2019, with the Court's permission, Altezza filed a motion to dismiss the second amended complaint.  Dkt. No. 51.  On December 5, 2019, the Court denied in part and granted in part the motion to dismiss.  Dkt. No. 64.  The Court rejected Altezza's argument that *res judicata* barred the claims of the present lawsuit based on the proceedings in a separate contract action Mr. Alcaraz brought against Altezza in state court in January 2018.  The Court also denied the motion to dismiss the Fair Housing Act claim and claim for injunctive relief.  The Court granted the motion to dismiss the Fourteenth Amendment claim, with leave to amend.

Prior to the hearing on the motion for preliminary injunction and before Mr. Alcaraz's amended complaint came due, the Court stayed the case and referred Mr. Alcaraz to the Federal Pro Bono Project for appointment of counsel.  *See* Dkt. No. 67.  On March 11, 2020, the Court appointed pro bono counsel for Mr. Alcaraz and issued an order setting further deadlines.[5]

On April 22, 2020, Mr. Alcaraz, through newly appointed counsel, filed a third amended

---

[5] The Order included a new deadline for Mr. Alcaraz to post his $5,000 bond.  Mr. Alcaraz posted the bond as ordered.  Dkt. Nos. 70, 72, 83.

complaint along with a motion for preliminary injunction.  TAC; Dkt. No. 76 ("Prelim. Inj. Mot.").  The third amended complaint, which is now the operative complaint, names as defendants KMF Oakland LLC; Klingbeil Capital Management, Ltd.; and Altezza Condo LLC.[6]  Mr. Alcaraz raises four claims for relief: discrimination on the basis of race, color, and/or national origin in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("Claim One"); discrimination on the basis of race in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 et seq. ("Claim Two"); discrimination on the basis of race, color, ancestry, and/or national origin in violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51-52 ("Claim Three"); and discrimination on the basis of race, color, ancestry, and/or national origin in violation of the Unfair Competition Law ("UCL"), Cal. Bus. and Profs. Code § 17200 et seq. ("Claim Four").

On May 6, 2020, Altezza filed an opposition to the motion for preliminary injunction along with a motion to dismiss and to strike certain language from the third amended complaint.  Dkt. Nos. 86 ("Prelim. Inj. Opp'n"), 90 ("Mot. to Dismiss").  The Court held a telephonic hearing on the motion for preliminary injunction and the motion to dismiss on June 11, 2020.

## LEGAL STANDARDS

### I.     Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."

---

[6] Klingbeil Capital Management was the management company of The Emerson when KMF Oakland owned the building and is "an indirect parent company of, and/or shares a parent company with," KMF Oakland.  TAC ¶¶ 4-5.  On May 29, 2020, after the deadline to answer had passed, defendant KMF and Klingbeil Capital Management ("Klingbeil Defendants") entered their first appearance in this case.  *See* Dkt. No. 99.  Mr. Alcaraz and the Klingbeil Defendants then filed a stipulation, which the Court approved, specifying that: the Klingbeil Defendants will take no actions, during the pendency of this action or after final judgment, to effectuate plaintiff's eviction from his home; the Klingbeil Defendants will not oppose plaintiff's motion for a preliminary injunction and will not be the subject of any preliminary injunctive relief ordered by the Court pursuant to that motion; that plaintiff will not seek the relief specified in paragraphs H & I of the "Relief Requested" section of the TAC against the Klingbeil Defendants; and that the Klingbeil Defendants will file any motion to dismiss the TAC by June 17, 2020.  Dkt. Nos. 100, 101.

United States District Court
Northern District of California

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## II.      Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that a court may, on its own or on motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that arises from litigating spurious issues by dispensing of those issues before trial. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). However, motions to strike are generally disfavored. *Rosales v. Citibank, Fed. Sav. Bank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001). In most cases, a motion to strike should not be granted unless "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).

## III.      Motion for Preliminary Injunction

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. In order

United States District Court
Northern District of California

to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted).  Courts have also applied an alternative "sliding scale" or "serious questions" test, requiring that the plaintiff raise "serious questions going to the merits" and show that "the balance of hardships tip[s] sharply in plaintiff's favor."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011); *id.* at 1135 (stating plaintiff must also show a "likelihood of irreparable injury and that the injunction is in the public interest.").  The sliding scale approach allows courts to balance the factors, offering flexibility where, for example, the plaintiff makes a weaker showing of likelihood of success, but a strong showing of irreparable harm.[7]  *Id.* at 1131.  Regardless of the approach, a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22; *see also Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (plaintiffs "face a difficult task in proving that they are entitled to this 'extraordinary remedy[.]'").

A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  However, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988)).

---

[7] *Winter* did not completely reject the validity of the sliding scale approach to preliminary injunctions. *Alliance for the Wild Rockies*, 632 F.3d at 1134.  Under the "sliding scale" approach used in the Ninth Circuit – also dubbed the "serious question" test in *Alliance for the Wild Rockies* – "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131.  Thus, even after *Winter*, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (citations omitted).

**DISCUSSION**

**I.      Defendant's Motion to Dismiss and Motion to Strike**

The Court first addresses defendant Altezza's motion to dismiss the third amended complaint and to strike certain claims, because resolution of the motion to dismiss may impact the Court's analysis of the preliminary injunction motion.

Altezza argues: (1) the Court should dismiss Claim Two for failure to exhaust administrative remedies under FEHA, (2) the Court should dismiss Claim Four for failure to state sufficient facts under the UCL, and (3) the Court should strike language relating to Claims Two and Four along with language that requests an injunction, as Altezza argues that remedy is not available.

**A.      Claim Two: FEHA**

Altezza requests that the Court dismiss Mr. Alcaraz's claim under FEHA because Mr. Alcaraz has failed to exhaust administrative remedies, to wit, that he failed to first "file a written charge with the California Department of Fair Housing ('DFEH') within one year of the alleged unlawful discrimination and obtain a notice from DFEH of the right to sue . . . ."[8] Mot. to Dismiss at 10. Mr. Alcaraz does not dispute that he did not exhaust but counters that the administrative exhaustion requirement applies only to allegations of discrimination in the employment context and that there is no exhaustion requirement under FEHA for housing discrimination. Dkt. No. 94 ("Opp'n to Mot. to Dismiss") at 11-12.

Mr. Alcaraz is correct.  California Government Code section 12989.1, governing the commencement of civil actions regarding housing discrimination under FEHA, states, in part, "An aggrieved person may commence a civil action whether or not a complaint has been filed under this part and without regard to the status of any complaint." Cal. Gov't Code § 12989.1; *see also Wood v. Vista Manor Nursing Ctr.*, No. C 06-01682 JW, 2006 WL 2850045, at *5 (N.D. Cal. Oct. 5, 2006) (distinguishing FEHA claims of employment discrimination from housing discrimination and finding that the Court may hear the latter regardless of administrative exhaustion).  Defendant

---

[8] Mr. Alcaraz notes that the agency's correct name is the California Department of Fair Employment and Housing.

United States District Court
Northern District of California

appears to concede as much by failing to address the FEHA exhaustion argument at all in its reply brief. *See* Dkt. No. 98 ("Reply ISO Mot. to Dismiss").

The Court DENIES Altezza's motion to dismiss Claim Two.

**B.      Claim Four: UCL**

Regarding the UCL claim, Altezza argues that Mr. Alcaraz (1) has failed to allege that he "suffered injury in fact and has lost money or property as a result of [the] unfair competition" and (2) that he "fails to plead a violation of an underlying law upon which he purports to rest his UCL claim." Mot. to Dismiss at 11 (quoting Cal. Bus. & Prof. Code § 17204).

Under the UCL, a litigant must have "suffered injury in fact and . . . lost money or property as a result of the unfair competition" in order to have statutory standing. Cal. Bus. & Prof. Code § 17204. This means that a party suing for violation of the UCL must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice . . . that is the gravamen of the claim." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011). The California Supreme Court has explained that "[t]here are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.* at 323. "This list is not exhaustive, however, and a private plaintiff need only establish that he or she has 'personally suffered such harm.'" *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1019 (N.D. Cal. 2019) (quoting *Kwikset*, 51 Cal. 4th at 323). As the California Supreme Court has explained, the purpose of the economic injury requirement of the UCL, as enacted into law in 2004 via Proposition 64, is "to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices." *Kwikset*,

51 Cal. 4th at 317; *see also id.* at 320-21.

The third amended complaint alleges numerous facts that, if true, suffice to meet the standing requirement under the UCL.  For instance, plaintiff alleges that on August 26, 2016, he received a letter from Mark Chow, from Altezza's real estate marketing and sales firm, stating that Altezza "would like to provide you the first opportunity to purchase your unit at the price below:  . . . $630,000."  TAC ¶ 35; TAC Ex. N at 2-3 (Aug. 26, 2016 Mark Chow Letter).  The letter included contact information for a mortgage lender and stated, "Please contact the Mortgage Consultant below to begin the process of qualifying for a mortgage loan for the purchase of your unit."  TAC Ex. N at 3.  Mr. Alcaraz further alleges that on September 30, 2016, Mr. Chow told him over the phone that Altezza "would be happy to sell to Mr. Alcaraz as the occupant."  TAC ¶ 36.  Mr. Alcaraz memorialized the call in an email that same day, stating,

> In summary, my understanding from our call is that the sale price of unit number 403 will be $630,000 and that a letter will be forthcoming in mid-October detailing the mechanics of the sale/escrow process.
>
> As I mentioned this morning, I currently have one of my properties in Mexico for sale that will net around $389,000 in proceeds that I will use for the purchase of the unit in Oakland.  The rest will come from funds that I have liquid.
>
> I would like to reiterate that I will be moving forward with the purchase of unit number 403 at 6465 San Pablo Avenue in Oakland (California), that it will be an all cash sale, and that I would like to expeditiously move towards closing.

TAC Ex. O at 2.  Mr. Alcaraz further alleges that he subsequently "went through with the sale of the property in Mexico in order to be ready to purchase the unit."  TAC ¶ 37.  In late 2017, Mr. Alcaraz learned that Altezza would not sell him his unit, *id.* ¶ 42, and to this date he has not succeeded in purchasing his unit.

Mr. Alcaraz alleges,

> As a result of defendants' discrimination, Mr. Alcaraz lost the opportunity to purchase his home.  Likewise, because of defendants' evasive delay tactics when he believed a sale was still possible, he lost out on years of opportunity to purchase another condominium in Oakland at a similar price.
>
> []Now, there are no condominiums in Oakland available for sale at a price equivalent to the fair market price at which he agreed to purchase his home—$630,000.  In 2016, when Mr. Alcaraz agreed to purchase his home, there may have been other condominiums in Oakland affordable to Mr. Alcaraz.  However, in the years that passed while Altezza delayed in executing the sale, real estate prices in Oakland have

United States District Court
Northern District of California

1   climbed such that there are no longer condominiums in the city affordable to Mr. Alcaraz.

2   *Id.* ¶¶ 50-51.

3       These allegations, if true, more than suffice to meet the standing requirement under the UCL.

4   Mr. Alcaraz has alleged that because Altezza led him to believe that he would be able to purchase

5   his unit in Oakland, he was "required to enter into a transaction, costing money or property," i.e.,

6   the sale of his property in Mexico, "that would otherwise have been unnecessary." *See Kwikset*, 51

7   Cal. 4th at 323. Mr. Alcaraz has also alleged that he has had a "present or future property interest

8   diminished" because Altezza engaged in "evasive delay tactics" such that Mr. Alcaraz wasted over

9   a year of time trying to purchase his unit and that climbing real estate prices mean he can no longer

10  afford a condominium in Oakland. *See id.*; TAC ¶¶ 50-51. These are not "conclusory" statements,

11  as Altezza argues. *See* Reply ISO Mot. to Dismiss at 6. Rather, Mr. Alcaraz has provided detailed

12  allegations throughout the TAC that, if true, would show he suffered economic injury sufficient to

13  survive a motion to dismiss.

14      Nor does the UCL claim fail to plead a violation of any underlying law. As Mr. Alcaraz

15  notes in his opposition, the UCL claim for relief incorporates by reference the claims raising

16  violations of the FHA, FEHA, and the Unruh Act. Opp'n to Mot. to Dismiss at 12; TAC ¶ 70. In

17  its reply brief, Altezza does not pursue this argument further.

18      The Court DENIES Altezza's motion to dismiss Claim Four.

19

20  **C.    Injunctive Relief**

21      Pursuant to Federal Rule of Civil Procedure 12(f), Altezza also moves to strike Mr. Alcaraz's

22  request for injunctive relief. Altezza argues that none of Mr. Alcaraz's causes of action provide for

23  the injunctive relief that he seeks in the third amended complaint, namely, his request that the Court:

24      I.      Preliminarily and permanently enjoin defendants (or their officers, agents,
        servants, employees, and attorneys) and/or the Alameda County Sheriff's Office
25      from proceeding on the execution of the writ of possession obtained in Alameda
        County Superior Court with regard to the residence at which Mr. Alcaraz resides at
26      6465 San Pablo Avenue, Unit 403, Oakland, California, from taking any other
        measures to effectuate evicting Mr. Alcaraz from his home, and from selling Mr.
27      Alcaraz's home to any buyer other than Mr. Alcaraz.

28

United States District Court
Northern District of California

> J.      Issue an order compelling defendant Altezza Condo, LLC to sell plaintiff his home at the $630,000 price agreed to in 2016.

TAC at 14; Mot. to Dismiss at 12-15; Reply ISO Mot. to Dismiss at 14-15.  Altezza also argues that Mr. Alcaraz is attempting to relitigate the state court UD Action and that res judicata bars him from doing so.[9]

Mr. Alcaraz opposes on several grounds.  First, Mr. Alcaraz urges that Altezza has waived this argument because it could have litigated this in its prior motion to dismiss, and that Rule 12(g) bars Altezza from raising this defense now.  Mr. Alcaraz argues that the federal Fair Housing Act allows for the injunctive relief that he seeks.  Mr. Alcaraz also avers that the UD Action does not bar his requested relief, under the law of the case and under res judicata.

Federal Rule of Civil Procedure 12(g) states that, except for certain circumstances not present here, "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." *See* Fed. R. Civ. P. 12(g)(2).  The Court agrees with Mr. Alcaraz that Altezza's request to strike the prayer for certain injunctive relief was available to Altezza but omitted from its motion to dismiss the second amended complaint, which Altezza filed in November 2019.  *Compare* Dkt. No. 23 ("SAC") at 19 *with* TAC at 14.  Indeed, Altezza moved to dismiss the claim for injunctive relief from the SAC but made only a cursory argument in support of this point.  *See* Dkt. No. 51-1 ("Mot. to Dismiss SAC") at 14.  To the extent that Altezza argues the TAC requests a new form of relief that Mr. Alcaraz did not previously seek, namely, an injunction preventing the sale of plaintiff's unit to anyone other than him, the Court examines this further as part of its analysis on the preliminary injunction motion, *infra*.

Likewise, in its prior motion to dismiss, Altezza could have but did not raise its argument that the UD Action has res judicata effect barring Mr. Alcaraz's requested relief.  The Court noted in its December 2019 Order Denying in Part and Granting in Part Motion to Dismiss, "Altezza does not argue that the Unlawful Detainer Action precludes the instant action.  Regardless, due to their

---

[9] Altezza also requests the Court strike any references to FEHA or the UCL from plaintiff's prayer for relief.  Mot. to Dismiss at 12.  Because the Court has denied Altezza's motion to dismiss these claims from the third amended complaint, *see supra*, the Court likewise declines to strike references to FEHA or the UCL in the prayer for relief.

summary nature, unlawful detainer proceedings have limited res judicata effect.  *Madrid v. KMF Fremont, LLC*, No. 11-CV-05804 NC, 2012 WL 12883829, at *3 (N.D. Cal. Apr. 19, 2012)."  Dkt. No. 64 at 5 n.4.  The Court will not now allow Altezza a second bite at the apple to argue that the UD Action should preclude the racial discrimination claims raised in this case.

Accordingly, defendant Altezza's motion to dismiss the third amended complaint is DENIED.

## II.      Plaintiff's Motion for Preliminary Injunction

Mr. Alcaraz requests a preliminary injunction "effectively extending the relief accorded in the temporary restraining order to endure for the remainder of this litigation, until he has had a full opportunity to prevail on the merits of his housing discrimination claims."  Prelim. Inj. Mot. at 8. Specifically, he requests

> a preliminary injunction, effective during the whole pendency of this action, prohibiting Defendants (or their officers, agents, servants, employees, and attorneys) and/or the Alameda County Sheriff's Office from proceeding on the execution of the writ of possession obtained in Alameda County Superior Court with regard to the residence at which Mr. Alcaraz resides at 6465 San Pablo Avenue, Unit 403, Oakland, California, from taking any other measures to effectuate evicting Mr. Alcaraz from his home, and from selling Mr. Alcaraz's home to any buyer other than Mr. Alcaraz.

*Id.* at 27.

In opposition, Altezza argues that Mr. Alcaraz cannot show a likelihood of success on the merits because he is not entitled to the injunctive relief he seeks.  Altezza also argues the equities cut against an injunction, stating that Altezza will be irreparably harmed if Mr. Alcaraz is allowed to remain in his unit any longer.  Finally, in the alternative, Altezza asks that the Court require a bond if a preliminary injunction issues.

As explained below, the Court finds that all four of the *Winter* factors weight in favor of the issuance of a preliminary injunction and that an injunction should therefore issue.

### A.      Likelihood of Success

"The first factor under *Winter* is the most important—likely success on the merits."  *Garcia*

United States District Court
Northern District of California

*v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted).  Courts treat likelihood of success as a "threshold inquiry," disregarding the other factors when a plaintiff fails to show a likelihood of success on the merits.  *See id.*  In his motion, Mr. Alcaraz focuses on the likelihood of success on his Fair Housing Act claim, and so too will the Court's analysis here.  *See* Prelim. Inj. Mot. at 16-22; *see also Walker v. City of Lakewood*, 272 F.3d 1114, 1131 (9th Cir. 2001) (applying the same standards to FHA and FEHA claims) (citing *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal. App. 4th 138, 150 n. 6 (1997)).

### 1.     Fair Housing Act—Legal Standard

With certain limited exceptions, the federal Fair Housing Act makes it unlawful--

**(a)** To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

**(b)** To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

. . .

**(d)** To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available. . . .

42 U.S.C. § 3604.

The Ninth Circuit "'appl[ies] Title VII discrimination analysis in examining Fair Housing Act discrimination claims.'  [Citation.]  A plaintiff can establish a FHA discrimination claim under a theory of disparate treatment or disparate impact."  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (citing *Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997)).[10]

As such, the Ninth Circuit has adapted the *McDonnell Douglas* burden-shifting framework to the Fair Housing Act context.  Under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), a plaintiff alleging disparate treatment "must first establish a prima facie case of discrimination[.]"  *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007)

---

[10] Mr. Alcaraz seeks a preliminary injunction based on a theory of disparate treatment, not disparate impact.  Prelim. Inj. Mot. at 17 n.6.

17

1

(citation omitted).

2

3

4

> Adapted to this situation, the prima facie case elements are: (1) plaintiff's rights are protected under the FHA; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury.[] Establishing the prima facie case affords the plaintiff a presumption of discrimination. This test does not permit the court to consider rebuttal evidence at the prima facie case stage.

5

6

7

> After the plaintiff has established the prima facie case, the burden then must shift to the defendant to articulate some legitimate, nondiscriminatory reason for the action. To accomplish this, the defendant is only required to set forth a legally sufficient explanation.

8

9

10

11

12

13

> Assuming the defendant can successfully rebut the presumption of discrimination, the burden shifts back to the plaintiff to raise a genuine factual question as to whether the proffered reason is pretextual. A plaintiff may succeed in persuading the court that she has been a victim of intentional discrimination, "either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." The trier of fact may consider the same evidence that the plaintiff introduced to establish a prima facie case in determining whether the defendant's explanation is merely pretext. *Id.* "Once a prima facie case is established . . . summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination."

14

*Harris*, 183 F.3d at 1051 (citations omitted).

15

16

17

18

19

The *McDonnell Douglas* burden-shifting framework does not apply where the plaintiff is "able to advance direct evidence of discrimination." *Gilligan v. Jamco Devel. Corp.*, 108 F.3d 246, 250 (9th Cir. 1997) (citations omitted); *see also Cmty. House*, 490 F.3d at 1045-46 (finding district court erred in applying *McDonnell Douglas* test in Fair Housing Act case involving a facially discriminatory men-only shelter policy).

20

21

## 2.    Application Here

22

23

24

25

26

27

28

In this case, the *McDonnell Douglas* framework applies because Mr. Alcaraz has not come forward with direct evidence of discrimination. In his third amended complaint, plaintiff alleges the following salient facts. In March 2011, KMF purchased the building where plaintiff resided. TAC ¶ 14. Johnny Rodriguez managed the building for KMF. *Id.* ¶ 15. The first time Mr. Alcaraz and Mr. Rodriguez interacted, Mr. Rodriguez asked if Mr. Alcaraz was at the building to perform maintenance work. *Id.* ¶ 18. "Every so often after that, Mr. Rodriguez would ask of Mr. Alcaraz, 'Oh, you're still here?' –implying surprise that Mr. Rodriguez [sic] was capable of maintaining a

United States District Court
Northern District of California

tenancy in the building." *Id.* "On other occasions, Mr. Rodriguez told Mr. Alcaraz that he spoke English well." *Id.* Mr. Rodriguez also made other remarks, such as asking if Mr. Alcaraz's car was owned by his employer and telling "Mr. Alcaraz that he looked like he was more suited to perform maintenance work at The Emerson than to be a tenant." *Id.*

Plaintiff alleges that beginning in early 2015 he "began being assessed 'late' fees on rent checks that he timely paid by mail. *Id.* ¶ 19. At the time, Bianca Rodriguez was responsible for processing rent checks for the building and was in a romantic relationship with Mr. Rodriguez. *Id.* ¶ 20. In mid-2015 Mr. Alcaraz began hand delivering his rent checks to Ms. Rodriguez at her office in San Ramon, California. *Id.* ¶ 22. Despite calling ahead to confirm that she would be there to accept the check, "on most of Mr. Alcaraz's attempts to hand deliver the checks, Ms. Rodriguez would no longer be in her office when Mr. Alcaraz arrived[,]" thereby forcing him to leave his rent checks under her office door. His rent checks continued to be processed in an untimely manner, and on at least one occasion Ms. Rodriguez said she did not receive Mr. Alcaraz's check even though he delivered it. *Id.* On September 24, 2015, KMF filed an unlawful detainer action against plaintiff that it ultimately dismissed when the parties reached a new agreement on how to process Mr. Alcaraz's rent checks. *Id.* ¶¶ 23-24. "In early 2016, Klingbeil again failed to process Mr. Alcaraz's rent checks." *Id.* ¶ 26. On March 11, 2016, KMF filed another unlawful detainer action against Mr. Alcaraz for unpaid rent. *Id.*

After Altezza bought the building in June 2016, it initially accepted Mr. Alcaraz's rent payment. *Id.* ¶¶ 27-29. On August 1, 2016, KMF obtained a judgment of writ of possession in the UD Action. *Id.* ¶ 33. In late August and September 2016, plaintiff had multiple communications with Mark Chow from the real estate and marketing firm that Altezza hired; Mr. Chow told Mr. Alcaraz that Altezza would like to sell Mr. Alcaraz's unit to him at a price of $630,000. *Id.* ¶¶ 35-36. Mr. Alcaraz made preparations to get the funds together to purchase the unit and informed Mr. Chow that he planned to make an all cash purchase. *Id.* ¶¶ 36-38. In the meantime, in 2017, sales agents for Altezza began selling units in the building. *Id.* ¶ 39. Mr. Alcaraz alleges that he "often observed the sales agents' behavior shift depending on the identity of the prospective buyers" and that "[i]f a prospective buyer appeared to be Hispanic or African-American, the sales agents would

be unfriendly, making the prospective buyer wait around for help while more quickly attending to other prospective buyers." *Id.* ¶ 40.

In late 2017, one of the sales agents, Amy Fox, "told Mr. Alcaraz that Altezza would not sell him his home. She told him that the owners would sell to anyone but him. When Mr. Alcaraz asked Ms. Fox why the owners would not sell to him, . . . Ms. Fox told him it was because they did not like him." *Id.* ¶ 42. Mr. Alcaraz further alleges that "[b]y mid-2018, all of the units in The Emerson, except for Mr. Alcaraz's home, had been sold at least once. None of the buyers were of Hispanic descent. The units comparable to Mr. Alcaraz's home were all sold in the range of $630,000." *Id.* ¶ 45.

The Court finds that these allegations, and the documentation plaintiff provides to support them, suffice to establish a prima facie case of discrimination at this stage of the proceedings. *Harris v. Itzhaki* is instructive.[11] There, the Ninth Circuit reversed a district court's grant of summary judgment in favor of a landlord defending a claim of racial discrimination under the Fair Housing Act. The plaintiff, an African American tenant, brought three independent claims under the FHA. One of these was for eviction notices she received that were contrary to her landlord's established policy.[12] Ms. Harris presented evidence that in December 1995 she overheard Ms. Waldman, a fellow tenant who assisted the landlords in showing vacant apartments and in collecting rent checks, state to the building repairman, "The owners don't want to rent to Blacks." 183 F.3d at 1048. "Ms. Harris immediately informed Ms. Waldman that her comments were 'illegal and racist.'" *Id.* Four months later, the landlords stated they did not find Ms. Harris's rent check in its usual place. The same thing occurred the following month, "causing Ms. Harris to send all subsequent payments by certified mail. Ms. Harris presented evidence that she suffered emotional distress as a result of the

---

[11] Some courts have called into question the continuing viability of *Harris*'s holding on the question of standing under the FHA, following the Supreme Court's decision in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011). *See Lee v. Retail Store Employee Building Corp.*, No. 15-cv-04768-LHK, 2017 WL 346021, at *7 (N.D. Cal. Jan. 24, 2017). However, defendant has not raised standing as a reason why plaintiff's claim should fail, and the Court finds *Harris* to be instructive on the merits of an FHA discrimination claim.

[12] The other two claims were for disparate treatment of rental testers and for a discriminatory statement by Ms. Waldman, who helped with the building operations.

notices and feared a racially motivated eviction in the future." *Id.* at 1052.  Although the landlords had an "informal procedure" of calling a tenant whose rent had not been received by the tenth of the month, Ms. Harris received no such call and instead received two notices to pay rent or quit, for April 1996 and May 1996. *Id.* at 1049.  Based on these facts, the Ninth Circuit found Ms. Harris had established a prima facie disparate treatment claim under the FHA. *Id.* at 1052.  The appellate court further found that the landlords' stated reasons for their actions—"that they simply didn't get the check and that the phone call is merely a courtesy to the tenant"—raised a genuine factual question as to whether the landlords' "nondiscriminatory reason is pretextual, thereby making summary judgment inappropriate." *Id.*

In this case, Mr. Alcaraz alleges multiple comments by KMF's property manager indicating surprise that Mr. Alcaraz could afford to live in the building and stating that Mr. Alcaraz looked more suited to performing maintenance work.  The individual with whom the property manager was romantically involved began refusing or untimely processing Mr. Alcaraz's rent checks, leading to two eviction actions against him.  After Altezza purchased the building, Altezza initially accepted rent from Mr. Alcaraz and told him that it would sell him his unit at a price of $630,000, for which he indicated he would pay in all cash.  Altezza never followed through with the sale, and ultimately its sales agent told Mr. Alcaraz that Altezza would not sell him his home "because they did not like him." TAC ¶ 42.  Mr. Alcaraz observed sales agents acting unfriendly toward prospective buyers who appeared to be Hispanic or African-American.  By mid-2018, all of the other 32 units in the building had been sold but none were sold to buyers of Hispanic descent.  Taken together, these allegations suffice to establish a prima facie case of disparate treatment.

In response, Altezza states that it never offered to sell Mr. Alcaraz his unit and that the "only reason" it did not offer to sell him the unit "was because he was under eviction for non-payment of rent when the units were being sold." Burke Decl. ¶ 11.  The Court finds this position unconvincing. The judgment in the UD Action was entered August 1, 2016, and Mr. Alcaraz has come forward with a letter dated August 26, 2016, from Mark Chow, addressed to Mr. Alcaraz, informing him that Altezza "would like to provide [him] the first opportunity to purchase [his] unit" at the price of $630,000, and providing various contact information, including for a mortgage consultant at

Citibank.  TAC Ex. N at 2-3.  Altezza does not address this letter other than to object to it as hearsay and lacking foundation and to say that Altezza had hired Level Four, where Mark Chow worked, "to oversee the process of selling the condominiums" but that Altezza "never gave Level Four authority to sell any of the units.  Only Defendant, as the owner of the building, had authority to agree to sell any of the condominiums."  Prelim. Inj. Opp'n at 17-18; Burke Decl. ¶ 7.[13]  Thus, Altezza appears to have been moving forward with the sale of the unit to Mr. Alcaraz even after the judgment of possession had been entered against him.  Additionally, Mr. Alcaraz has raised questions about whether the underlying UD Action was itself motivated by racial discrimination, and it would make little sense for a racially motivated eviction to then be able to form the basis for a legally valid refusal to sell Mr. Alcaraz his unit.[14]

Nor is the Court persuaded by Altezza's argument that Mr. Alcaraz is not likely to succeed on the merits of his claim because he is not entitled to the injunctive relief that he seeks.  Altezza argues that even if Mr. Alcaraz succeeds on his claims, he will not be entitled to an order prohibiting Altezza from selling Mr. Alcaraz's unit to anyone else, nor will he be entitled to an order that Altezza must sell the unit to him.  Prelim. Inj. Opp'n at 11.  To start, setting aside the matter of whether the requested relief is appropriate, Mr. Alcaraz will plainly be entitled to relief of any sort only if he first succeeds on the merits, and Altezza's argument does not go to the merits of plaintiff's claim.  Altezza also cites the state court ruling in a prior contract action involving the same parties, but the Court has already ruled that case does not have preclusive effect here.  *See* Dkt. No. 64 at 7.  Altezza also argues that Mr. Alcaraz is seeking a "mandatory injunction, *i.e.* an order restraining Defendant

---

[13] For purposes of this motion only, the Court OVERRULES Altezza's evidentiary objections to the August 26, 2016 Mark Chow letter.  *See Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

[14] Because Altezza does not argue otherwise, for purposes of this Order, the Court assumes, without deciding, that Johnny Rodriguez, Bianca Rodriguez, and Amy Fox were acting as agents of the defendants when they made the statements at issue.  *See Harris*, 183 F.3d at 1054 (holding that the "question whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law, not state law[,]" and is a question that "should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts") (citations omitted).

from entering upon its own real property and from selling its own real property to whoever it wants, which is 'particularly disfavored[.]'" Prelim. Inj. Opp'n at 12 (citing *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994)). The Court disagrees that Mr. Alcaraz seeks a mandatory injunction. Rather, Mr. Alcaraz's request that he not be evicted and that his unit not be sold to anyone else during the pendency of this case is a "prohibitory injunction that preserves the status quo." *Stanley*, 13 F.3d at 1320 (citation omitted). As to Mr. Alcaraz's request in the complaint for an order that Altezza be compelled to sell him his unit for $630,000, this is not relief that Mr. Alcaraz requests as part of the preliminary injunction, and the Court agrees with Mr. Alcaraz, *see* Dkt. No. 93 ("Reply ISO Prelim. Inj. Mot.") at 8-9, that this matter need not be decided here today.[15]

Based on the above, the Court finds that at minimum plaintiff has raised "serious questions going to the merits" of his FHA claim." *See Alliance for the Wild Rockies*, 632 F.3d at 1131-32.

### B.    Irreparable Harm

Under the second *Winter* factor, the irreparable injury must be both likely and immediate. *See Winter*, 555 U.S. at 22; *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). As this Court previously observed when granting plaintiff's motion for a temporary restraining order, irreparable harm is nearly always presumed in cases such as these. *See, e.g., Cmty. House*, 940 F.3d at 1048 ("It is undisputed that the balance of hardships tips in favor of the plaintiffs who were excluded from Community House due to the men-only policy"); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("We have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered

---

[15] The Court notes that in its opposition brief, Altezza supports its assertion that the FHA does not provide for the remedy of forcing defendant to sell its property to plaintiff with a citation to 42 U.S.C. § 3612. That section governs enforcement of the FHA by the Secretary of Housing and Urban Development. Section 3613 governs enforcement by private persons, and allows the court to enter, as it "deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such [discriminatory housing] practice or ordering such affirmative action as may be appropriate)[,]" subject to certain exceptions. 42 U.S.C. § 3613(c)

United States District Court
Northern District of California

irreparable injury from the fact of the defendant's violation."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) ("because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury.").

Moreover, both parties appear to agree that, in the absence of an injunction, Altezza would be actively seeking to effectuate the writ of possession on Mr. Alcaraz's unit. In its reply brief in support of its motion to dismiss, Altezza files a request for judicial notice, attaching an August 2019 order amending the complaint, judgment, and writ of possession in the UD Action to reflect the plaintiff and payee to be Altezza Condo LLC, as well as a judgment in the UD Action re-entered in Alameda County Superior Court in August 2019. Dkt. No. 97.[16] "[W]rongful eviction is not an injury for which remedies available at law are adequate." *Johnson v. Macy*, 145 F. Supp. 3d 907, 920 (C.D. Cal. 2015). The Court finds this factor weighs in Mr. Alcaraz's favor.

### C.    Balance of Equities

As the Court previously observed, if Mr. Alcaraz is evicted and his residential unit sold to another buyer, then he will be unable to recover the full relief contemplated by the Fair Housing Act, even if he ultimately prevails on that claim. Mr. Alcaraz and his family have resided in this unit for over nine years, and the loss of the ability to purchase this particular unit is not one that can be compensated for with money damages alone.

By contrast, the countervailing harms that Altezza cites are ones that can be compensated

---

[16] Altezza has filed two requests for judicial notice, attaching various court documents from prior state court actions involving Mr. Alcaraz. *See* Dkt. Nos. 91, 97. While "a court may take judicial notice of the existence of matters of public record, such as a prior order or decision," it should not, however, take notice of "the truth of the facts cited therein." *Marsh v. San Diego Cnty.,* 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006) (citations omitted). "[T]aking judicial notice of findings of fact from another case exceeds the limits of [Federal] Rule [of Evidence] 201." *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014). Accordingly, the Court GRANTS the requests for judicial notice at Dkt. Nos. 91 and 97 to the extent defendant asks the Court take notice of the existence of the documents and court proceedings but does not take notice of the truth of any underlying facts litigated in the state court cases.

with money damages.  *See* Prelim. Inj. Opp'n at 15.  Altezza asserts that if Mr. Alcaraz's motion is granted, Altezza would be irreparably harmed because it "has had and would continue to have no way to access its own property to ensure it is being properly maintained or that Plaintiff is not causing any damages." *Id.*  It asserts that Mr. Alcaraz's continued occupancy of the unit is damaging its value, but cites no evidence, other than a declaration stating the same, that Mr. Alcaraz is inflicting any specific harm on the unit or that the inability to maintain the unit is causing irreparable damage.  *See id.* (citing Burke Decl. ¶ 14).

The Court concludes that the balance of hardships tips sharply in plaintiff's favor under the facts stated above.  *See Johnson*, 145 F. Supp. 3d at 920-21 (finding "the balance of hardships tips sharply in favor of plaintiff, who faces eviction—likely a wrongful one—from an affordable home in which she has lived for over a decade" and granting preliminary injunction preventing her eviction during the pendency of her FHA suit).

### D.    Public Interest

Altezza does not address the public interest factor, and this factor also weighs in favor of Mr. Alcaraz.  *See United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) ("the Supreme Court has found the FHA serves an 'overriding societal priority'") (citations omitted); *Johnson*, 145 F. Supp. 3d at 921 ("In the FHA, Congress declared that 'it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.' Accordingly, courts have emphatically declared that the public interest is served by effective enforcement of the FHA.") (citations omitted).

For the reasons stated above, the Court will GRANT plaintiff's motion for a preliminary injunction.

### E.    Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained. . . ."  Fed. R. Civ. P. 65(c).  "The district court retains discretion 'as to the amount of security required, *if any*.'"  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)).

Altezza asks that, if the Court is inclined to grant the motion for preliminary injunction, the Court order Mr. Alcaraz "to post a bond of $3,500 from August 1, 2019 monthly until this case is resolved and that the bond be paid directly to the client trust account of Perry Johnson Anderson Miller & Moskowitz, LLP."  Prelim. Inj. Opp'n at 16.  Altezza argues this is especially needed in light of Mr. Alcaraz's delay in paying the bond previously ordered, his recent filing of bankruptcy actions, and his failure to pay filing fees on appeal in state court.  *Id.* at 16-17.  In reply, Mr. Alcaraz argues that a bond is not necessary, particularly where he has already posted a bond of $5,000.00 in this case.  Reply ISO Prelim. Inj. Mot. at 12.  Mr. Alcaraz notes also that the crux of his claim is that, but for defendant's unlawful discrimination, Mr. Alcaraz would already own his home and would therefore not need to pay rent.  *Id.*

The request for a bond is somewhat unusual here, in that Altezza steadfastly maintains that Mr. Alcaraz is not a tenant, yet its request for $3,500 per month is one that it bases on local rents in the area.  *See* Burke Decl. ¶ 15.  Other district courts that have issued preliminary injunctions during the pendency of FHA claims similar to Mr. Alcaraz's have not ordered bonds where the plaintiffs were already paying rent during the pendency of the case.  *See Bischoff v. Brittain*, No. 14-cv-019709-KJM-CKD, 2014 WL 5106991, at *2, 9 (E.D. Cal. Oct. 10, 2014) (granting preliminary injunction restraining landlord from evicting plaintiffs during pendency of FHA action so long as plaintiffs remained current on rent); *see also Johnson*, 145 F. Supp. 3d at 920 (noting plaintiff had never been untimely in paying her rent and there was no evidence that she would be unable to pay her rent during the remainder of the litigation).

Given that Mr. Alcaraz is not currently paying rent, the Court finds a bond of $1,000.00 per month is appropriate here.  This amount is sufficient to provide a level of protection to Altezza's financial interests should Mr. Alcaraz not ultimately prevail on his claims, but is not so great as to undermine plaintiff's ability to gather the funds to purchase his unit, if that opportunity should result either after trial or mediation.  Mr. Alcaraz has already paid a bond of $5,000.00 in this case, and

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    the Court will apply that bond prospectively to the first five months of the bond payment due on the

2    preliminary injunction.

3         In other words, **beginning on November 15, 2020, and no later than the 15th of each**

4    **month thereafter while this case is pending, Mr. Alcaraz shall post a bond, either individually**

5    **or through a surety, deposited to the Court's registry, in the amount of $1,000.00.**  Mr. Alcaraz

6    may do this by depositing the funds, along with a copy of this Order, at the Intake desk at the Clerk's

7    Office on the 16th Floor of the San Francisco Courthouse.

8         If, when Mr. Alcaraz's bond comes due, shelter-in-place orders are still in effect, or if access

9    to the San Francisco Courthouse remains limited due to COVID-19, Mr. Alcaraz may post the bond

10   either: (1) by mail, post-marked no later than the 15th, or (2) in person, at the Clerk's drop-box in

11   the lobby of the San Francisco Courthouse at 450 Golden Gate Avenue.  The bond shall be in the

12   form of a check/money order or cashier's check payable to "CLERK U.S. DISTRICT COURT" and

13   with the case name and case number on the payment.  Mr. Alcaraz shall include with the payment a

14   copy of this Order.  Mr. Alcaraz should retain a copy of the proof of payment for his records and

15   should email the Court's Courtroom Deputy (Teddy_VanNess@cand.uscourts.gov) and the Court's

16   Finance Department (Ana_Banares@cand.uscourts.gov) to inform them when the payment is

17   mailed or placed in the drop-box.

18

19                                 **CONCLUSION**

20        For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant

21   Altezza Condo LLC's motion to dismiss and motion to strike the Third Amended Complaint (Dkt.

22   No. 90).

23        The Court GRANTS plaintiff's motion for a preliminary injunction (Dkt. No. 76).  The Court

24   hereby GRANTS a preliminary injunction, effective during the whole pendency of this action,

25   prohibiting defendant Altezza Condo LLC (or its officers, agents, servants, employees, and

26   attorneys) and/or the Alameda County Sheriff's Office from proceeding on the execution of the writ

27   of possession obtained in Alameda County Superior Court with regard to the residence at which Mr.

28   Alcaraz resides at 6465 San Pablo Avenue, Unit 403, Oakland, California, from taking any other

measures to effectuate evicting Mr. Alcaraz from his home, and from selling Mr. Alcaraz's home to any buyer other than Mr. Alcaraz.

**Beginning November 15, 2020,** Mr. Alcaraz shall post a bond of $1,000.00 per month for the duration of this case, in the manner described above.

**No later than June 25, 2020,** each party to this case shall file an ADR Certification, as required by Civil L.R. 16-8(b) and ADR L.R. 3-5 (b).  By that same date, the parties shall also file a joint statement notifying the Court of their selection of an ADR process, as discussed at the hearing.  *See* Dkt. No. 103.


**IT IS SO ORDERED**.

Dated: June 12, 2020

_____

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California